Commonwealth *v.* Parker, Appellant.

Argued January 12, 1973. Before Jones, C. J., Eagen, O'Brien, Roberts, Pomeroy, Nix and Manderino, JJ.

*Charles Lowenthal,* with him *Ronald J. Brockington,* for appellant.

*Albert L. Becker,* Assistant District Attorney, with him *Milton M. Stein* and *James T. Ranney,* Assistant

District Attorneys, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE MANDERINO, October 16, 1974:

The appellant, Sidney Parker, was convicted in a nonjury trial of murder in the second degree and the possession of narcotic drugs. His pretrial application to suppress an oral and a signed statement given to the police after his arrest was denied. These statements, which were admitted into evidence during appellant's nonjury trial, were similar to appellant's testimony at the trial. Motions for a new trial and in arrest of judgment were denied and appellant received a sentence of one to five years imprisonment for the murder and a consecutive three years sentence of probation for the possession of narcotic drugs. This appeal followed.

The evidence established that Thomas Smith, a close friend of the appellant for many years, died after an injection of heroin. The events preceding Smith's death were as follows. Smith, following a disagreement with his girlfriend, purchased a fifth of gin and visited the appellant and the appellant's wife on the evening of February 6, 1971. Several relatives of the appellant's wife were also present. During the visit, which lasted about two and one-half to three hours, Smith drank several glasses of gin. Around midnight, the appellant and Smith went out. Smith wanted to get some heroin and agreed to pay for it since the appellant had no money. The appellant said he knew where a purchase could be made. Both Smith and the appellant were drug users and had previously taken narcotics together. Two "nickel bags" of heroin were purchased and the two men went to a friend's home, known as a "shooting gallery," where visitors could take heroin. After their arrival, Smith began to drink again, even though the

appellant told him he should stop drinking. Smith wrapped a belt around his arm and attempted to insert into his vein a needle attached to a syringe containing heroin. When Smith had trouble hitting his vein, the appellant, at Smith's request, inserted the needle into Smith's vein. Smith then took over again and injected the heroin into his body. There is no evidence that the amount of heroin was other than Smith's normal dose. A short while later, Smith began moaning and slid to the floor. The appellant and other men present in the room went to the aid of Smith and attempted to revive him. When these efforts failed, the appellant wrapped Smith in a bedspread and took him to the hospital. The appellant then notified Smith's family by telephone that Smith was at the hospital in serious condition. Shortly thereafter, the appellant was told that Smith was dead.

Appellant was still at the hospital, waiting for Smith's parents, when the police arrived about ten or fifteen minutes later. When questioned by the police appellant said that he had found Smith and brought him to the hospital but denied any involvement in Smith's death. The appellant was then taken to the police station where he continued to deny any involvement until about sixteen hours later, when he gave statements to the police containing the facts previously recited in this opinion.

The appellant contends that the evidence, including his statements, was insufficient to establish his guilt of murder beyond a reasonable doubt. We agree and thus reverse and discharge the appellant as to the murder conviction.

Malice aforethought, express or implied, which is a necessary element of the crime of murder, may be found from the attending circumstances of the act resulting in the death. If the act of a defendant under all of the circumstances gives rise to an inference that the appel-

lant must have known that death to another was likely to result, malice aforethought is present. *Commonwealth v. Coleman*, 455 Pa. 508, 318 A.2d 716 (1974); *Commonwealth v. Bowden*, 456 Pa. 278, 309 A.2d 714 (1973); *Commonwealth v. McFadden*, 448 Pa. 277, 292 A.2d 324 (1972); *Commonwealth v. Malone*, 354 Pa. 180, 47 A.2d 445 (1946). In this case, however, we cannot conclude that malice aforethought was present from the appellant's act of inserting the needle into Smith's vein at Smith's request.

In *Commonwealth v. Bowden,* we said: "[W]e do not believe the necessary element of malice can be implied from [one's] act of injecting [another person] with the drug, heroin. Initially, although we recognize heroin is truly a dangerous drug, we also recognize that the injection of heroin into the body does not generally cause death. Unfortunately, there are thousands of individuals who use or abuse heroin daily." *Bowden* at 284, 309 A.2d at 718. The following testimony of the Deputy Medical Examiner, a prosecution witness in this case, is in agreement with our conclusion in *Bowden*:

"There is, in response to people's using drugs, and let's say specifically opiate drugs and, more specifically, heroin, not at all a clear, presently understood mechanism for why people die from administering these drugs or being administered these drugs.

"Certain individuals may take a given amount of drugs for days and weeks and have no reaction. They may take the same amount on a given day at a given time and the reaction to that administration is death, or serious illness.

"It is not a simple matter of an overdose as such, in the usual understood way, in which if 100 people take an excess quantity of a given material and let's, for example, say carbon monoxide, it will kill all 100 people, and each of those people getting that excess

quantity of carbon monoxide in the usual sense of the word received an overdose, or an over-amount of carbon monoxide.

"This same translation is not true and you can't make the same interpretation in the realm of the use and abuse of, particularly, the opium narcotics."

Although the facts of this case differ from those in *Bowden* in one respect, a different legal conclusion is not warranted. In *Bowden*, there was no evidence that the deceased had been drinking, whereas in this case the appellant knew that Smith had been drinking and testified that heroin and alcohol "don't mix" and could be "deadly." The prosecution, however, presented no evidence that death generally occurs when heroin is taken following the consumption of alcohol. Without such evidence, we cannot accept the validity of the premise suggested. The truth of the matter may well be to the contrary since the combined use of alcohol and heroin is not uncommon in our society. Moreover, significant doubt was expressed by the prosecution's expert as to whether the *interrelationship* of alcohol and heroin or the heroin by itself was the cause of death. The Deputy Medical Examiner, after testifying that "death occurred as a result of narcotic drug and ethanolism" added the following in response to the prosecutor's questions: "Q. When you say the cause of death was the adverse effect of narcotic drugs and ethanolism, is the presence of one or the other significant in terms of bringing about death? A. The significance here is that they both were significantly present. *Their interrelationship is not sufficiently clear so as to say that one is dependent upon the other,* so as to say, from my examination and the circumstances surrounding this death, and the toxicologic findings; there is the presence of ethanolism, this is a depressant drug, and there is the presence of a narcotic drug. This is also a de-

pressant drug. The two together are significant by virtue of their presence. The death could well have been considered as simply an adverse effect of narcotic drug with the ethanolism as a significant contributing circumstance or factor. In this instance the choice of the term adverse effect of narcotic drug and ethanolism was only by virtue of their significant presence, meaning the narcotic and the level of alcohol. Q. *Do I understand you to say, Doctor, that the presence of the drug, the narcotic in this particular case, was the cause of death by itself?* A. *It could have been in my opinion, yes.* Q. *Alright. Now, the presence of ethanolism, was that a necessary prerequisite to death, in your opinion?* A. *No, not necessary."* (Emphasis added.)

In *Bowden,* we recognized that the proportion of deaths to the number of times narcotics are used is not nearly great enough to justify an assumption that one taking heroin is running a substantial and unjustified risk that death will result. *People v. Pinckney,* 38 App. Div. 2d 217, 219, 328 N.Y.2d 550, 556-557 (1972); *see also Beckham v. Travelers Ins. Co.,* 424 Pa. 107, 225 A. 2d 532 (1967). Similarly, in the absence of evidence to the contrary, we cannot assume that one who takes heroin after drinking runs a substantial and unjustified risk that death will result. We must therefore conclude that the appellant's act of assisting his friend with the insertion of a needle in this case, like the appellant's act in *Bowden,* was not an act from which we can infer that appellant must have known that death was likely to result. The prosecution also argues that by assisting Smith, appellant committed a felony and that malice should be implied from the commission of that felony. We reject this theory for the reasons fully discussed in the opinion of Mr. Justice NIX concurring in *Commonwealth v. Bowden,* 456 Pa. 278, 285, 309 A.2d 714, 718 (1973).

Since the necessary element of malice aforethought was not present in this case, the judgment of sentence for murder is reversed and the appellant is ordered discharged as to that judgment.

There remains the appeal from the judgment of sentence for the possession of narcotic drugs. *See* Act of July 31, 1970, P. L. 673, No. 223, art. V, §503(a), 17 P.S. §211.503(a). The appellant contends that the trial court erred in not suppressing the oral and written statements given by the appellant to the police. The appellant argues that the statements should have been excluded because they were reasonably related to an unncessary delay between arrest and arraignment. Since the appellant challenged the admissibility of his statements prior to trial and since *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972), was not decided until six days after appellant's judgment of sentence, the issue of the unnecessary delay is properly before us. *Commonwealth v. Wayman*, 454 Pa. 79, 309 A.2d 784 (1973).

All evidence obtained during an unnecessary delay between arrest and arraignment must be excluded except that which has no reasonable relationship to the delay whatsoever. *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972); *see also Commonwealth v. Dixon*, 454 Pa. 444, 311 A.2d 613 (1973); *Commonwealth v. Dutton*, 453 Pa. 547, 307 A.2d 238 (1973); *Commonwealth v. Tingle*, 451 Pa. 241, 301 A.2d 701 (1973).

In this case there was a delay of sixteen hours before appellant made any inculpatory statements. The appellant was taken from the hospital to the police station at approximately 2:55 a.m., on the morning of February 7, 1971. During the next sixteen hours, the appellant was subjected to alternating periods of interrogation and isolation. Approximately six hours of questioning took place during four different interroga-

tion sessions involving four different police officers. Appellant continually denied any involvement in the death of Smith and made no inculpatory statements concerning the possession of drugs during the first sixteen hours. At 6:55 p.m., the appellant began crying and said that he wanted to tell the truth. Shortly thereafter, the appellant made his first inculpatory statement. At 3:35 a.m., the following morning, February 8, 1971, over eight hours after the appellant's first inculpatory statement, he signed a written statement. He was arraigned later that morning, some thirty-one hours after his arrival at the police station.

There is no evidence in the record to justify the sixteen hour delay before the first inculpatory statement and no evidence that anything other than the delay prompted the appellant to make the inculpatory statements. Under these circumstances, we must conclude that the delay was unnecessary and was reasonably related to the inculpatory evidence obtained. The evidence should have been excluded. That error was not harmless beyond a reasonable doubt. Although the statements and the appellant's trial testimony were similar, there were significant differences which could have affected the verdict. In the statements, the appellant admits the physical possession of the narcotics which were purchased with money provided by Smith. A reading of the appellant's trial testimony, however, leaves some doubt as to whether or not appellant ever had physical possession of the narcotics. Under these circumstances, we are unable to conclude that the admission of the statements was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 17 L.Ed.2d 705, 87 S. Ct. 824 (1967); *Commonwealth v. Davis,* 452 Pa. 171, 305 A.2d 715 (1973).

The judgment of sentence for murder of the second degree is reversed and appellant is discharged as to that judgment. The judgment of sentence for the pos-

session of narcotic drugs is reversed and a new trial awarded.

Mr. Chief Justice JONES dissents.

———

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE POMEROY:

I concur in the reversal of the judgment of sentence on the murder conviction. I respectfully dissent, however, from the reversal of the judgment of sentence for possession of narcotic drugs because it is based upon a retrospective application of the exclusionary rule first announced in *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972). *See* the dissenting opinion of this writer in *Commonwealth v. Johnson*, 458 Pa. 425, 327 A.2d 618 (1974) and the opinions therein cited.

Mr. Justice EAGEN joins in this dissenting opinion.