STATE of Minnesota, Respondent,

v.

David FORSMAN, Appellant.

No. 46927.

Supreme Court of Minnesota.

Sept. 2, 1977.

Rehearing Denied Dec. 12, 1977.

Thomson, Wylde, Nordby, Blethen & Peterson, Bailey W. Blethen and Jack S. Nordby, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., Richard G. Mark, Asst. Atty. Gen., Frederick S. Suhler, Jr., Sp. Asst. Atty. Gen., St. Paul, John Corbey, County Atty., Mankato, for respondent.

Heard before PETERSON, KELLY, and SCOTT, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Defendant, David Forsman, was found guilty by jury verdict of two counts of distributing heroin and one count of third-degree murder for the death of Randy Winters, who died after defendant allegedly injected heroin into his body. On appeal from the judgment of conviction and from denial of his post-trial motions, defendant contends that the evidence was insufficient to support a finding that the quantity of morphine [1] found in Winters' body caused his death; that drug distribution felonies are not "inherently dangerous" and should not invoke the felony-murder rule; and that defendant was denied a fair trial by the admission of evidence of other crimes. We affirm.

On October 3, 1975, Miles Miller brought decedent, Randy Winters, to the emergency room at St. Joseph's Hospital in Mankato, where Winters was pronounced dead. The time of his death was estimated at 10 p. m. that day. An autopsy revealed the morphine content in his blood [2] but no morphine in his urine, which placed the time of the injection at around 9 p. m. The autopsy also revealed 6 needle marks in the bend of the right arm, 6 on the back of the left hand, and 23 on the front of the left knee.[3]

Miller was the prosecution's major witness at trial and gave this version of the relevant events. On October 3, 1975, Miller drove Winters to the farmhouse rented by defendant and Pam Johnson about 16 miles southeast of Mankato. Miller and Winters arrived some time between 7 and 9 p. m., with the purpose of purchasing heroin from defendant. They waited while a woman delivering Tupperware spoke with defendant.[4] When she left, defendant came into the room where Miller and Winters were waiting. After a brief discussion regarding how much heroin they desired, defendant left and returned to the room with three small paper packages containing heroin, for which Miller and Winters paid him $150. There was a package of needles and syringes in the room. Defendant suggested that Miller and Winters split one of the bags of heroin. He placed approximately half of one package on a spoon, added water, held a match under it until it boiled, "took the needle off the syringe and wadded up a little piece of cotton and filtered it into the syringe and then put the needle back on." Defendant injected Winters in the arm, and within seconds Winters "pass[ed] out." Upon Miller's request, defendant injected Miller with a little less than the remaining solution.[5] Defendant and Miller carried Winters to Miller's automobile and Miller drove off. He returned several minutes later, worried about Winters, whose breathing had slowed. Defendant told Miller to take Winters to the hospital in Mankato but declined to accompany them and advised Miller not to mention where they had been. When later informed of decedent's death, defendant stated, "Yes, I thought he would."

Defendant testified to a different version of the facts. According to him, no heroin was injected at his house on the evening of October 3. Rather, Miller and Winters had been drinking when they arrived at his house between 8:30 and 9 p. m., and Miller told defendant that Winters "had done"

1. Heroin metabolizes into morphine when injected into the body.

2. We find no merit in defendant's argument that the state did not prove that the heroin in Randy Winters' body caused his death.

3. Winters' wife testified that her husband was right handed; the inference may be drawn that someone other than himself had injected him in the right arm on several occasions.

4. This woman's testimony placed the arrival of two young men at shortly after 8:30 p. m. She left defendant's house at approximately 9 p. m. She did not see the faces of the two men, because they went in the back door while she and defendant stood at the front door.

5. Prior to defendant's trial, Miller was convicted for possession of heroin stemming from his part in the incident giving rise to this prosecution. He was sentenced to 3 years' probation and a $750 fine. Miller had been discharged early from the army some years earlier as a result of his heavy use of heroin.

some heroin earlier in the evening. Miller wanted to buy some heroin from defendant, but defendant told him he had none.[6] Meanwhile, Winters was having difficulty staying awake and began to snore loudly. They carried him to the car; Miller left but returned shortly and defendant then advised him to drive Winters to the hospital.

1. The first issue we reach is defendant's contention that a drug distribution felony, voluntarily solicited by a person whose death results therefrom, should not invoke the felony-murder rule, Minn.St. 609.195(2), because the felony is not "inherently dangerous." In his brief, defendant writes: "This issue arises not from a reading of the third degree murder statute, but from a review of the common law in the United States out of which the felony-murder rule has developed."

Defendant's argument is misdirected. Because common-law crimes were abolished by adoption of our criminal code, any analysis of the applicability of a penal statute must begin with a reading of the statute. No act is a crime unless so defined by a statute. Minn.St. 609.015. It is the exclusive province of the legislature to define by statute what acts shall constitute a crime and to establish sanctions for their commission; our consideration of penal statutes is limited to determining whether the statute infringes upon any individual's constitutional rights. *State v. Bean,* 199 Minn. 16, 270 N.W. 918 (1937); *State v. Mathiasen,* 273 Minn. 372, 141 N.W.2d 805 (1966). Resort to common-law rules is proper but only to aid in statutory construction (Minn.St. 609.015, subd. 1); e. g., where the language of a statute based on the common law is doubtful. *State v. Cantrell,* 220 Minn. 13, 18 N.W.2d 681 (1945). Where the language of a penal statute, like that of any other statute, is clear, we do not resort to construction aids. *State v. End,* 232 Minn. 266, 45 N.W.2d 378 (1950). We may not disregard the letter of the law "under the pretext of pursuing the spirit." Minn.St. 645.16.

The statute at issue in this case, Minn.St. 609.195, provides:

"Whoever, without intent to effect the death of any person, causes the death of another by either of the following means, is guilty of murder in the third degree and may be sentenced to imprisonment for not more than 25 years:

\* \* \* \* \* \*

"(2) Commits or attempts to commit a felony upon or affecting the person whose death was caused or another, except rape or sodomy with force or violence within the meaning of section 609.-185."

The language of this provision is unambiguous and incorporates no common-law terms. The distribution of heroin by direct injection into the body of another [7] is a felony "upon or affecting the person whose death was caused" thereby. Because the statutory language applies to the act for which defendant was convicted, we need not decide how the rule which developed at common law to limit the felony-murder doctrine to felonies "inherently dangerous" to human life would apply to this case.[8] We do note that the "inherently dangerous" limitation developed to alleviate the harsh consequences of the felony-murder rule as lesser and lesser crimes, particularly property offenses, were made felonies.[9] By including the words "upon or affecting the person" in Minn.St. 609.195(2), the legislature has ensured that a conviction for third-de-

---

**6.** Defendant testified that he only had heroin at his residence four or five times per month for his own use.

**7.** The state admits that distribution by other means, absent the "tactile quality" present here, would present a different issue.

**8.** Courts which have considered this issue are divided in result. Compare *Commonwealth v. Parker,* 458 Pa. 381, 327 A.2d 128 (1974); *State v. Mauldin,* 215 Kan. 956, 529 P.2d 124 (1974); *State v. Dixon,* 109 Ariz. 441, 511 P.2d 623 (1973); *People v. Taylor,* 11 Cal.App.3d 57, 89 Cal.Rptr. 697 (1970).

**9.** At the time the felony-murder rule was adopted, the common law recognized eight felonies, all of them punishable by death. Gardner, Criminal Law, p. 410.

gree murder will not result from a mere property offense.

2. Defendant's principal argument is that he was denied a fair trial by the admission of evidence of other crimes. He argues that evidence of a sale by defendant on December 10, 1975, of narcotics to an undercover agent was not admissible under any exception to the general rule excluding evidence of other crimes, and that other evidence which might fall within an exception was improperly admitted in the absence of compliance with the *Spreigl-Billstrom* [10] procedural requirements.

In addition to the December 10 sale of narcotics, the state introduced substantial evidence of other crimes, including testimony relative to a transaction on September 27 similar to that of October 3; drug paraphernalia; and circumstantial evidence of sales activity at defendant's residence.

Miller testified that on Saturday, September 27, he and Winters arrived at defendant's residence at approximately 2 p. m., with the purpose of purchasing drugs. Donnis Volk, Winters' brother-in-law, accompanied them. With defendant, the three went upstairs. Miller and Winters bought one $50 bag of heroin, and defendant injected each with half in the same manner as described above. Volk corroborated Miller's testimony relative to the injection by defendant, but he did not know where the heroin had come from; i. e., whether defendant sold it to them or Winters or Miller brought it along.

Defendant agreed that Winters, Volk, and Miller stopped at his house on September 27. But according to defendant, Winters brought heroin with him and asked defendant if the latter had equipment with which defendant would be willing to inject Winters. Although defendant stated that he did not believe he had ever told Winters that he himself used heroin, he did not think it strange that Winters asked if he had equipment and if he would perform the injection. At any rate, defendant procured the needle and syringe which he testified he kept outdoors, away from the house, and injected both Winters and Miller.

As required by Rule 7.02, Rules of Criminal Procedure,[11] the state had given defendant written notice prior to trial that it intended to introduce evidence of this previous offense of distribution. The written notice did not state under what exception to the general exclusionary rule this evidence would be admissible. An omnibus hearing was held before trial, but no objection to the use of this evidence was raised by the defendant at that time, nor did the state broach the subject. The defendant did not object to the introduction of this evidence at trial, nor did he request a cautionary instruction at the time it was received. Defendant did request such an instruction at the close of the trial, and one was included in the court's charge.

The state also called defendant's landlord, Joseph Pestka, and Pestka's son, Wayne. They testified that there were numerous visitors to defendant's house, at all hours of the day and night, and that many stayed for a short period of time. Joseph Pestka had occasion to enter defendant's residence prior to October 3, when defendant was not present. In an upstairs room, he found a wastebasket containing blood-stained cotton balls and several needles. On the table was a candle, a small bowl, a spoon, and a jug containing what he thought to be alcohol. Soon after, he brought his son over to the house, who also saw the above mentioned items. Additionally, Wayne found a syringe in the drawer of a dresser located in

10. *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965); *State v. Billstrom,* 276 Minn. 174, 149 N.W.2d 281 (1967).

11. Rule 7.02, Rules of Criminal Procedure, the *Spreigl-Billstrom* rule, provides in pertinent part: "The prosecuting attorney shall notify the defendant or his counsel in writing of any additional offenses the evidence of which may be offered at the trial under any exceptions to the general exclusionary rule. In cases of felonies and gross misdemeanors, the notice shall be given at the Omnibus Hearing under Rule 11 or as soon thereafter as the offenses become known to the prosecuting attorney. * * * Such additional offenses shall be described with sufficient particularity to enable the defendant to prepare for trial."

the same room. Several days after October 3, defendant and Pam Johnson left the farmhouse. Wayne Pestka entered the house again, but the things described above, except for the syringe, were gone. Pestka gave the syringe to the police. On October 25, defendant returned to the farmhouse. Pestka notified the police, who arrested defendant while he was moving things out of the house.[12]

That same day, police officers executed a search, pursuant to warrant, of defendant's residence. They found three blood-stained cotton balls, a piece of pottery containing cotton balls, and a pair of trousers with a needle in one ·pocket. In Pam Johnson's automobile, the officers found a "junkie kit" containing paper, cotton, and needles.

A copy of the inventory listing the items seized by the officers was left on the kitchen table. A notice pursuant to Rule 7.01, Rules of Criminal Procedure, was sent to defendant advising him that the prosecution held evidence obtained as a result of a search. The record does not disclose whether their admissibility was ever discussed before trial. These items and the syringe given to the police by Pestka were all introduced at trial and without objection by defendant. No cautionary instruction was requested nor given.

Mid-trial, a *Spreigl* hearing was held to determine the admissibility of evidence relating to a sale of narcotics by defendant on December 10, 1975. The state learned about it after the omnibus hearing in this case, but before trial, and notified defendant before trial. The state argued that this evidence was admissible "to demonstrate a common plan or scheme" and "as evidence that this Defendant was habitually dealing in narcotics, specifically in heroin." The court ruled the evidence admissible.

Accordingly, a special agent for the Department of Justice, the drug enforcement administration, testified that on December 10, 1975, he met defendant and one Robert Douglas in Minneapolis, where they initiated negotiations for the sale of ¼ ounce of

heroin for $850. Defendant's "source" wanted the $850 in advance, but the agent refused to pay the entire amount before having at least seen the heroin. Ultimately, the three drove to St. Paul, where the exchange took place by stages. First, the agent paid defendant $120. A second undercover agent followed defendant to a house at 2027 DeSoto Street, St. Paul. Defendant entered the house, later emerged, and returned to the agent with a small amount of heroin. This proceeded until the exchange was completed.

Although defendant objected to the introduction of this evidence during the *Spreigl* hearing, he made no objection in the presence of the jury. No cautionary instruction was requested nor given at the time the evidence was received.

■ The general rule in a criminal case is that "evidence which in any manner shows or tends to show that the accused has committed another crime independent of that for which he is on trial is inadmissible." *State v. Dinneen,* 300 Minn. 354, 356, 220 N.W.2d 292, 294 (1974); *State v. Sweeney,* 180 Minn. 450, 455, 231 N.W. 225, 227, 73 A.L.R. 380, 385 (1930). The reasons for this rule are clear; but not among them is that such evidence lacks probative value. Rather, as Wigmore stated, "It is objectionable, not because it has no appreciable probative value, but because it has too much." 1 Wigmore, Evidence (3 ed.) § 194. He states three policy justifications for this exclusionary rule which can be described as follows: (1) The tendency of the jury to find the defendant guilty of the charge, irrespective of the proof, because defendant is a likely culprit; (2) the tendency of the jury to punish the defendant for the charge if for no other reason than that he escaped punishment on other occasions; and (3) the hardship posed to defendant in preparing a defense against uncharged offenses. Minnesota cases acknowledge these policy considerations.

---

**12.** Before the police arrived, defendant told Pestka that he and Pam were leaving to take jobs in Madison, Wisconsin. At trial, defendant admitted this was not true.

The exceptions to this rule are equally well established. They derive from a recognition that certain classes of evidence of this sort characteristically have probative value which outweighs their prejudicial effect, although in each case the trial court must still make an independent determination that the probative value of the offered evidence does outweigh its prejudicial effect on the facts of that particular case. These categories of evidence serve a legitimate evidentiary function apart from raising the otherwise impermissible inference that defendant probably committed the charged offense because he has committed others. These exceptions have frequently been described in Minnesota as evidence of other crimes introduced to show:

"* * * (1) motive, (2) intent, (3) absence of mistake or accident, (4) the identity of the accused, (5) sex crimes, (6) a common scheme or plan embracing the commission of similar crimes so related to each other that proof of one or more of such tends to establish the accusation." *State v. Dinneen,* 300 Minn. 354, 357, 220 N.W.2d 292, 294.

We have no difficulty in finding evidence of the September 27 incident admissible under the "common scheme or plan" exception.[13] This exception was originally reserved for those offenses which could be described as preplanned steps in a larger scheme of which the charged offense was another step. See, e. g., *State v. Monroe,* 142 Minn. 394, 172 N.W. 313 (1919); *State v. Sweeney,* 180 Minn. 450, 231 N.W. 225 (1930); *State v. Spreigl,* 272 Minn. 488, 492, note 9, 139 N.W.2d 167, 170 (1967). The exception has evolved to embrace evidence of offenses which, because of their marked similarity in modus operandi to the charged offense, tend to corroborate evidence of the latter. See, e. g., *State v. Taylor,* 290 Minn. 515, 187 N.W.2d 129 (1971) (trial for kidnapping in which victim testified to methods used by kidnapper to force her into service as a prostitute; testimony of a second woman as to similar methods used by defendant on her held admissible).

We also hold that the physical evidence was admissible as corroborative of Miller's testimony relating to defendant's method of injection as well as the setting for the events of both September 27 and October 3. This also constitutes circumstantial evidence that defendant was engaged in the distribution of narcotics, as does testimony about frequent visitors at all hours of the day and for short periods of time. We believe that in a prosecution for distribution of narcotics, evidence that a defendant was "habitually dealing" in narcotics may be highly probative and, if its probative value outweighs its prejudicial value, is admissible. In this case, circumstantial evidence of distribution activities lends credence to Miller's testimony that their visits to defendant's house on September 27 and October 3 were not merely social visits.[14]

Although we have no difficulty deciding that the testimony of distribution activities centered around defendant's residence is probative and admissible, the admissibility of evidence of the December 10 St. Paul street sale of a large quantity of heroin presents a more difficult question. Its relevance is nevertheless apparent upon

---

13. Defendant admits that this evidence was probably admissible, but objects to the failure to circumscribe its admission by *Spreigl-Billstrom* procedural requirements. We discuss this argument *infra*.

14. Winters' wife testified that although she considered defendant and Pam Johnson friends, she had never been to their rented house and could not recall ever having telephoned either of them. Telephone company records showed that on both September 27 and October 3, approximately 1 hour before Winters arrived at defendant's, as established by other testimony, a telephone call of approximately 1 minute in duration was placed from the Winters' phone to the phone at defendant's residence. An inference may be drawn that before going to defendant's with the purpose of purchasing narcotics, Winters confirmed that his quest would be successful. Defendant testified that he recalled the telephone conversation of September 27 with Winters, which was "[s]trictly to find out if I was going to be home that afternoon."

close examination. Defendant admitted this sale but asserted that it was the only sale of heroin he had ever made.[15] He also testified that he knew nothing about 2027 DeSoto Street before that date, but, in rebuttal, the state introduced telephone records showing a September 4, 1975, call from the telephone at defendant's house to an unlisted number at 2027 DeSoto Street. This evidence established an inferential link between defendant's residence and his "source," a fact of at least marginal relevance, albeit not of critical importance to the state's case. We are in any event persuaded beyond a reasonable doubt that any error in the admission of that evidence was not prejudicial. Given Miller's testimony of the events transpiring on October 3 and his partly corroborated testimony that similar events took place on September 27; the testimony of defendant that he had injected Winters on September 27, even though no injection took place on October 3; the medical testimony placing the time of injection of decedent at 'close to 9 p. m., together with the physical improbability of self-injection; the testimony placing Miller and decedent at defendant's home at that time; defendant's flight from the scene soon after learning of Winters' death and his misrepresentations of his destination; and the circumstantial evidence of sales activity at defendant's residence, the evidence of defendant's guilt was overwhelming.

3. The final aspect of this issue is whether the otherwise admissible evidence was nevertheless improperly admitted because of the failure to comply with *Spreigl-Billstrom* procedural requirements. Rule 7.02, Rules of Criminal Procedure, explicitly embodies the *Spreigl* requirement that the prosecuting attorney give pretrial notice of any evidence of other crimes which it may offer at trial. This rule requires that in felony cases notice be given at the omnibus hearing or as soon thereafter as the offenses become known to the prosecuting attorney. The comment to the rule states:

"Rule 7.02 requires that the *Spreigl* notice * * * of additional offenses be given on or before the date of the Omnibus Hearing (Rule 11) in order that any issues that may arise as to the admissibility of the evidence of these offenses at trial may be ascertained and determined at the Omnibus Hearing. (Rule 11.04) If he learns of any such offenses after the Omnibus Hearing, he shall immediately give notice thereof to the defendant."

In the *Billstrom* case, decided 2 years after *Spreigl,* we enumerated several additional safeguards: At the time the evidence is offered, the prosecutor shall specify the exception to the general exclusionary rule under which it is admissible; and both at the time the evidence is received and in the final instructions, the court should give a limiting instruction in unequivocal language.

 In this case, notice was properly given of the September 27 offense, the physical evidence,[16] and the December 10 offense. With respect to the December 10 offense, at the mid-trial *Spreigl* hearing held in chambers, the prosecutor stated the exception under which he offered the evidence and the defendant objected. But with respect to neither of the other two categories of evidence was there an objection to its admission by defendant. With respect to none of the evidence was there,

---

**15.** Defendant later said he might have sold heroin on occasion to his friend, Robert Douglas.

**16.** Although the physical evidence was not mentioned explicitly in the Rule 7.02 *Spreigl* notice dealing with the September 27 offense, these items were listed in the inventory left at defendant's residence, and a Rule 7.01, Rules of Criminal Procedure, notice of intent to introduce evidence obtained as a result of a search and seizure was given to defendant. Furthermore, as circumstantial evidence of the October 3 events, this was not evidence of *other* offenses but evidence of the charged offense. Moreover, in *State v. Bowser,* 305 Minn. 431, 234 N.W.2d 890 (1975), we held that notice of evidence of participation in another offense covers physical instrumentalities seized in connection with that offense. Because the physical evidence is corroborative of the testimony of the September 27 offense, it is covered by the notice of that offense. We reiterate that the *better* practice would be to explicitly mention this evidence in the notice, but such practice is not mandatory.

at the time of its admission, a statement by the prosecutor as to the exception rendering it admissible, nor was a limiting instruction requested or given. A general instruction was given as part of the court's instructions at the close of trial.

No Minnesota case has squarely decided whether these procedures are mandatory with or without objection by defendant to admission of the evidence in the first instance. In both *Spreigl* and *Billstrom*, defendant had objected. In several cases, we have summarily treated the issue. In *State v. Martin,* 293 Minn. 116, 129, 197 N.W.2d 219, 227 (1972), for instance, we gave short shrift to defendant's allegation of error:

> "Defendant's objection to the testimony bearing upon the offense of bigamy may be disposed of by noting that he made no timely objection to this testimony."

In *State v. Dinneen,* 300 Minn. 354, 359, 220 N.W.2d 295, 296 (1974), in contrast, we felt "compelled" to note that the trial court erred not only in its ruling that offered evidence came within an exception to the exclusionary rule, but in failing to instruct the jury in the manner established by this court in *Billstrom.*

We now hold that once the state has given notice as required by Rule 7.02, the other *Spreigl-Billstrom* procedures became mandatory only upon the defendant's objection and/or request. Defendant's failure to request limiting instructions in this case is inexplicable. We reiterate that the trial court should, sua sponte, give an unequivocal limiting instruction both at the time the evidence is admitted and at the close of trial. But in the absence of a request, its failure to do so was not reversible error. We hold, accordingly, that the evidence of other offenses was properly admitted in this case.

Affirmed.