*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0910**

In the Matter of the Welfare of: D.N.W., Child

**Filed February 6, 2017
Affirmed
Peterson, Judge**

Hennepin County District Court
File No. 27-JV-16-487

Cathryn Middlebrook, Chief Appellate Public Defender, Susan J. Andrews, Assistant Public Defender, St. Paul, Minnesota (for appellant D.N.W.)

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, Minnesota (for respondent State of Minnesota)

Considered and decided by Larkin, Presiding Judge; Peterson, Judge; and Hooten, Judge.

## UNPUBLISHED OPINION

**PETERSON**, Judge

In this juvenile-delinquency appeal, appellant challenges the district court's determination that he assaulted "a family or household member." We affirm.

## FACTS

Appellant D.N.W. and the victim, M.T.G., met through social media in December 2015. After meeting in person, they dated for about two weeks. M.T.G. did not recall how many times she visited D.N.W.'s house, but she estimated that it was four or five times. Although the relationship was brief, on numerous occasions, D.N.W. asked M.T.G. to move to Florida with him. According to M.T.G., the couple argued "constantly," with the disputes sometimes becoming physical, so M.T.G. decided to end the relationship. D.N.W. was upset about M.T.G.'s decision, and M.T.G. testified that he would not let her leave him.

A couple of days before Christmas, D.N.W. contacted M.T.G. and asked her to come and stay with him at his house for the week. On Christmas Day, M.T.G. met D.N.W. at a shopping mall, and they left together in D.N.W.'s car. They got into an argument when M.T.G. tried to make it clear to D.N.W. that she did not want to be in a relationship with him. M.T.G. decided that she wanted to go home, but D.N.W. ignored her repeated requests to bring her home and, instead, drove to his house. D.N.W. yelled at M.T.G. and would not let her get out of the car.

Eventually, M.T.G. got out of the car and began running away, but D.N.W. caught up with her. D.N.W. claimed that the sweatshirt that M.T.G. was wearing was his, and he ripped the sweatshirt off M.T.G. He also ripped off M.T.G.'s earrings and pulled off her necklace. D.N.W. repeatedly pushed, shoved, and punched M.T.G., and he kicked garbage cans at her. M.T.G. had her cell phone in her hand and was trying to call someone to come

and get her when D.N.W. grabbed the phone out of her hand, broke it in half, and threw it across the street. M.T.G. used a bystander's phone to call 911.

D.N.W. was charged with misdemeanor criminal damage to property and misdemeanor domestic assault. The case was tried to the district court, and the district court found that the state proved beyond a reasonable doubt that D.N.W. committed both offenses. *See* Minn. R. Juv. Delinq. P. 13.09 (stating that "[w]ithin seven (7) days of the conclusion of the trial, the court shall make a general finding that the allegations in the charging document have or have not been proved beyond a reasonable doubt" and "[w]ithin fifteen (15) days of the conclusion of the trial, the court shall in addition specifically find the essential facts that support a general finding that the allegations in the charging document have been proved beyond a reasonable doubt"). The district court stayed adjudication of delinquency on both counts and placed appellant on probation. This appeal followed.

## D E C I S I O N

"On appeal from a determination that each of the elements of a delinquency petition have been proved beyond a reasonable doubt, an appellate court is limited to ascertaining whether, given the facts and legitimate inferences, a fact-finder could reasonably make that determination. This court must assume that the fact-finder believed the state's witnesses and disbelieved any contrary evidence." *In re Welfare of T.N.Y.*, 632 N.W.2d 765, 768 (Minn. App. 2001) (quotation and citation omitted); *see also In re Welfare of M.E.M.*, 674 N.W.2d 208, 215 (Minn. App. 2004) (stating that the same standard of review applies to court trials and jury trials).

Statutory interpretation is a question of law, which we review de novo. *State v. Mauer*, 741 N.W.2d 107, 111 (Minn. 2007). "It is the exclusive province of the legislature to define by statute what acts shall constitute a crime . . . ." *State v. Forsman*, 260 N.W.2d 160, 164 (Minn. 1977). "[W]e will not add to [a] statute what the legislature has intentionally or inadvertently omitted." *State v. Adickes*, 741 N.W.2d 904, 906 (Minn. App. 2007).

The domestic-assault statute provides that a person who "intentionally inflicts or attempts to inflict bodily harm" against "a family or household member" commits an assault. Minn. Stat. § 609.2242, subd. 1(2) (2014). The statutory definition of "family or household members" includes "persons involved in a significant romantic or sexual relationship." Minn. Stat. § 518B.01, subd. 2(b)(7) (2014). The definition statute also provides:

> In determining whether persons are or have been involved in a significant romantic or sexual relationship . . ., the court shall consider the length of time of the relationship; type of relationship; frequency of interaction between the parties; and, if the relationship has terminated, length of time since the termination.

*Id.* The district court's findings of fact specifically address the length of time of the relationship, the type of relationship, and the length of time between the termination of the relationship and the assault.

Regarding the length of time of the relationship, the district court found that D.N.W. and M.T.G. "had a brief romantic relationship." Although the relationship was brief, the

court noted that D.N.W. wanted to spend time with M.T.G. on Christmas and had mentioned her moving to Florida with him.

In addressing the type of relationship, the district court cited M.T.G.'s statement to police that D.N.W. was "her ex-boyfriend" and her trial testimony that D.N.W. followed her when she tried to walk away "after telling him she no longer wanted to date him." The district court specifically found that M.T.G.'s testimony was credible and consistent with her earlier statement to police.

Regarding the length of time since termination, the district court found that D.N.W. "became upset when M.T.G. said she did not want to date him anymore." Although M.T.G. had tried to end the relationship earlier, she testified that D.N.W. would not let her leave the relationship, and her testimony about what occurred on Christmas Day was that the assault occurred immediately after termination of the relationship.

Addressing the length-of-time and type-of-relationship factors, D.N.W. argues that the evidence is insufficient to prove that he and M.T.G. were involved in a significant relationship because, when the assault occurred, he and M.T.G. had been dating for only about two weeks; during that time, they frequently argued about whether they should be a couple; and both he and M.T.G. were teenagers. But the domestic-assault statute contains no age or time limit and, although D.N.W. and M.T.G. may have argued frequently, the evidence supports the district court's findings on the statutory factors, and the district court's findings on those factors support its determination that D.N.W. and M.T.G. were "involved in a significant romantic . . . relationship."

**Affirmed.**

5