# MARY WASHINGTON BROWN *v.* STATE OF MARYLAND

[No. 120, September Term, 1975.]

*Decided November 26, 1975.*

2

The cause was argued before GILBERT, DAVIDSON and MELVIN, JJ.

*Joseph B. Harlan, Assigned Public Defender,* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Philip V. Tamburello, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

Charlotte Lessem, a sixty-eight year old resident of North Carolina, was stabbed to death in the ladies' rest room of the Greyhound Bus terminal in Baltimore City on January 19, 1974. Mary Washington Brown and Tina Louise Green were charged with the murder of Lessem and the attempted robbery of her. Tina Louise Green was tried separately from the appellant, Mary Washington Brown. She is not a party to this appeal.[1] A jury in the Criminal Court of Baltimore, presided over by Judge John R. Hargrove, found appellant to be guilty of murder in the first degree. Appellant, following her being sentenced to life imprisonment, appealed to this Court.

Appellant mounts a nine-pronged attack upon the judgment of the trial court. She urges us to hold:

"I. The Trial Court erred to the irreparable

---

1. Miss Green was convicted of murder in the first degree, but because of a procedural defect the trial court granted a mistrial. Miss Green then pled guilty to the offense of attempted robbery with a dangerous and deadly weapon and she appeared as a State's witness against appellant.

prejudice of the Appellant by failing to strike the entire jury venire for the reason that they had previously been charged with respect to the law out of the presence of the Appellant.

II. The Trial Court erred to the irreparable prejudice of the Appellant by failing to suppress the introduction of the Appellant's tennis shoe and blood stains thereon.

III. The Trial Court erred to the irreparable prejudice of the Appellant by failing to suppress the introduction of the blood seized from the person of the Appellant.

IV. The Trial Court erred to the irreparable prejudice of the Appellant by refusing to permit the Appellant to call an expert witness with respect to the photographic identification of a coat.

V. The Trial Court erred to the irreparable prejudice of the Appellant, by permitting Tina Green to testify for the State.

VI. The Trial Court erred to the irreparable prejudice of the Appellant by permitting the State to enter the State's Exhibits. No. 3, 4, 7, 9, 10A, 10B, 14, 15 and 16.

VII. The Trial Court erred to the irreparable prejudice of the Appellant by striking the entire testimony of the character witness of the Appellant.

VIII. The Trial Court erred to the irreparable prejudice of the Appellant by erroneously placing the burden on the Defendant to overcome the presumption of second degree murder in a wrongful death case.

IX. The Trial Court erred to the irreparable prejudice of the Appellant by failing to direct a verdict in favor of the Appellant at

the conclusion of the State's case in chief
and at the conclusion of the entire case."

We shall discuss each of appellant's contentions in the order in which she has advanced them.

## I.

### *The Venire*

The practice before the Supreme Bench of Baltimore City is to assemble newly called jurors in an orientation program where the jurors are informed by a judge of the meaning of certain words. To some, the words may be part of an entirely new vocabulary. They are told the definition of such terms as "probable cause", "beyond a reasonable doubt", and "preponderance of the evidence." The judge who relates the meaning of those terms to the jurors does not advise the jurors how to apply them to particular or specific facts.

When the instant case was called to trial, appellant's counsel moved to disqualify the entire prospective jury panel on the basis that they had been "charged" by a judge of the Supreme Bench at the orientation as to legal principles applicable in criminal trials. The appellant contended that the "charging" of the venire was a "critical stage" of the proceeding, thus requiring the appellant's presence. Appellant reasons that inasmuch as she was not present during the "charge" and was not afforded an opportunity to submit requested instructions or interpose objections to the "charge", the entire venire must be disqualified. She apparently believes that she should be tried before a jury that has not been "tainted" by the orientation program.

Appellant's counsel argued to Judge Hargrove:

"... I ... repeat again, ... [that] she will be judged by a jury that was instructed as to the law generally, all about it, in criminal cases as well as in civil cases, that the jury that she never even heard instructions to, had no opportunity to object to the instructions to the jury that were given by a judge sitting on the bench, a judge not even

presiding in this trial, nor did she have a chance to put in her own prayers."

The first hurdle that appellant must clear in order to reach the substance of her assault on the Supreme Bench's orientation procedure is whether that educational program is a "critical stage" of the criminal process.

We note that *all* prospective jurors in the courts of the Supreme Bench [2] are apprised at orientation of some of the terms more frequently employed by counsel and judges. The orientation seems to be a verbalizing of the content of the booklet prepared by the Circuit Administrative Judges of Maryland, entitled, "A Handbook for Petit Jurors" and presumably in use throughout the State, with the addition of some other terms and local practices. The orientation is not intended as a substitute for the advisory instructions usually given to a jury at the close of the evidence in a criminal case. The orientation of the entire panel of jurors that is used throughout the courts of Baltimore City cannot be miscast by appellant as a "critical stage" of a criminal prosecution.

We know of no statute, rule of court, decision of the Supreme Court, the Court of Appeals of Maryland or of this Court that requires the presence of the accused when an entire panel of prospective jurors is being advised of its duties and responsibilities. Notwithstanding appellant's laborious efforts to analogize the case now before us to ". . . a lineup identification after formal charges . . ." whereby ". . . a defendant is permitted the presence of an attorney during a pre-trial lineup even though the capacity of the attorney is limited solely to that of being an observer," we fail to see the analogy.

Implicitly, appellant opts for a system whereby a jury which heard one criminal case would thereafter be excluded from further jury service unless all other defendants awaiting trial before the same panel of jurors were present

---

**2.** Besides the various parts of the Criminal Court of Baltimore, jurors are used in the Superior Court of Baltimore City, the Court of Common Pleas and the Baltimore City Court.

during the first trial in order that they might interpose exceptions to the judge's advisory instructions and perhaps request additional instructions. Such a system is absolutely unworkable. Alternatively, what appellant urges upon us would ultimately lead to a juror's serving in one criminal case and thereafter be forever disqualified.

Appellant's definition of "critical stage", requiring the presence of the accused, would, if adopted by the courts, create absolute chaos in the orderly administration of justice. We think appellant's contention ingenuous and devoid of merit.

## II

### Suppression of the Shoe

The transcript of the suppression hearing reveals that Detective Walter T. Egger, then of the Homicide Division of the Baltimore City Police Department, was called to the scene of the slaying. The detective saw that there was a partial footprint in a pool of blood on the ladies' rest room floor and what appeared to be blood smeared on a stairway wall and handrail. He also observed that there were ". . . droplets of blood [on the floor] leading across the open hallway there in the bus station to the front door area." He tracked the blood droplets to the 600 block of Howard Street, where, at the curb, the drops ceased to appear. A short time later he was called to the emergency room of Maryland General Hospital where he observed the appellant and another young woman.[3] Detective Egger identified himself as a police officer, made a visual examination for blood stains on the clothing the two young women were wearing, and asked them to hold up their feet so that he could examine their shoe soles. The white tennis shoes worn by appellant were manufactured with "an insert" in the sole where there was a label, and blood was seen in the insert. The detective seized the shoes and informed appellant ". . . that she was going to be taken to the Police Department Headquarters, the Homicide Squad."

---

3. The other young woman was Tina Green.

8

Prior to the time that Detective Egger went to the hospital emergency room, he had obtained, at the scene of the crime, a description of two suspects. He testified:

"From my notes that I made on the scene I have 'Suspects: Negro female, sixteen, check[ered] brown pants; Negro female, sixteen, yellow top, white jacket, fat.' "

Another description, slightly different, was received at the bus depot by Officer Robert L. Scott:

"Female Negro, fifteen to sixteen, five foot three, a hundred thirty pounds, brown checkered pants and white coat. The other female: Negro female, fifteen to sixteen, five foot three, a hundred and thirty pounds, had on green pants. . . ."

The description Officer Scott received was broadcast over the police radio network. Detective Egger readily admitted that appellant did not fit the height and weight portion of the broadcast description. He did state, however, that appellant ". . . fit the description that I [he] had received . . ." at the scene of the slaying. Egger said that appellant was wearing ". . . a white jacket and a yellow blouse." The other "suspect" was wearing checkered pants.

The thrust of appellant's argument in the trial court and here is that Detective Egger lacked probable cause to seize the blood stained tennis shoe. We do not see it that way. The Supreme Court in *Brinegar v. United States*, 338 U. S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949) stated:

"In dealing with the probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." 338 U. S. at 175.

We have defined probable cause as a non-technical conception of a reasonable ground for belief of guilt requiring less evidence than would justify conviction, but

more evidence than mere suspicion. *Cuffia v. State*, 14 Md. App. 521, 287 A. 2d 319 (1972); *Cleveland v. State*, 12 Md. App. 712, 280 A. 2d 520 (1971); *Cleveland v. State*, 8 Md. App. 204, 259 A. 2d 73 (1969). *See also Spinelli v. United States*, 393 U. S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969); *Carroll v. United States*, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, 39 A.L.R. 790 (1925); *Edwardsen v. State*, 243 Md. 131, 220 A. 2d 547 (1966).

The facts known to Detective Egger were that a woman had been slain, two young black women were seen leaving the site of the crime, one was wearing a yellow blouse and a white jacket, the other was wearing brown checkered pants, someone had been bleeding, someone had stepped into a pool of blood and there was a possibility that blood adhered to the shoe of that person. When appellant was observed at the hospital by the detective, she "fit" the description generally, if not specifically, of one of the two suspects. There was blood on the sole of her shoe. We think that knowledge on the part of Detective Egger to amount to more than mere suspicion even if we assume *arguendo* that it did not rise to the level of evidence that is sufficient to sustain a conviction. A warrantless arrest under Md. Ann. Code art. 27, § 594B (c) was justified by the facts known to the detective. Of course, once probable cause for the arrest was established the shoe was properly seized as evidence of the crime.

## III

### *Seizure of Blood Sample*

Pusuant to a seizure warrant issued by Judge James W. Murphy of the Supreme Bench of Baltimore City, the appellant was transported to the Maryland General Hospital where two vials of blood were extracted from her arm. *See Robinson v. State*, 18 Md. App. 678, 308 A. 2d 734 (1973). Appellant asseverates that because she was in custody and counsel had been appointed to represent her, ". . . she was entitled to be represented by counsel both at the proceeding in which the warrant was obtained and during the period of time when the blood was removed from her person."

10

Appellant bottoms her assertion upon lack of probable cause for the issuance of the warrant. She "reaffirms and realleges" her previous assertion relative to lack of probable cause for the arrest and further contends that the inclusion within the application for the warrant of the "confession" of Tina Green, renders the warrant defective. This is so, appellant says, because Tina Green's statement is hearsay and, because Tina Green was by her own admission a "co-conspirator", her statement ". . . should be viewed cautiously."

The warrant and the procedure for withdrawing blood samples from the appellant for a comparison with blood found at the murder scene was in keeping with the strictures we set forth in *Robinson v. State, supra.* Appellant candidly admits that ". . . there exists no case law [nor statute] directly on point in this State granting the defendant a right to counsel to represent her during the application for a warrant of seizure of blood from her person and for an attorney to be present during said seizure." There is no requirement that the accused's attorney be present when application is made for a search warrant. If the warrant is in fact defective, an accused has recourse, not at the time of application for the warrant, nor at the time of its execution, but rather by way of a motion to suppress the evidence. If the warrant is defective, for want of probable cause or otherwise, the evidence seized, in most instances, will be suppressed. The same is true if the warrant, while not defective, is unlawfully executed, such as where our holding in *Robinson v. State, supra,* is not followed.

The warrant in this case was issued on probable cause which was demonstrated to the issuing judge by a recitation of the facts known to Detective Egger, as well as a summary of the content of Tina Green's statement to the police in which she told of her and appellant's attempt to rob the decedent, an ensuing struggle between appellant and the decedent, and the stabbing of the decedent by appellant. Tina Green's statement was made at the time of her arrest. That the seizure warrant was issued on the basis of what appellant perceives as "hearsay" does not undercut its being

issued on probable cause. The rules of evidence do not apply to the issuance of search and seizure warrants.

## IV

### Expert Witness

Appellant maintains that she should have been allowed to call an expert witness to testify that the police mug shot, a black and white photograph, of the appellant wearing a jacket which appeared to Detective Egger to be white, was in fact not white at all. The underlying basis for the appellant's seeking to call the witness was in order for her to demonstrate that the appellant was not wearing a white coat and, thus, show that Detective Egger was without probable cause to effect the arrest of appellant when she was observed by him in the emergency room at Maryland General Hospital. The record reveals that when Detective Egger was being examined by appellant's counsel at the suppression hearing, he was asked to state what color jacket the appellant was wearing. Egger replied, "white". The mug shot was then shown to him and he was asked the color of the jacket as depicted by the photograph. He replied, "It was white." The photograph was marked, at appellant's request, for identification purposes only, and later introduced into evidence. Appellant sought permission to produce an expert witness who would testify from his examination of the photograph that the jacket worn by appellant was, in fact, not white. Judge Hargrove refused to allow the expert witness's testimony declaring that the jacket itself was the best evidence and that the appellant possessed the right to produce other witnesses to testify that the jacket was, in fact, not white.

The general rule is that the allowance or disallowance of the testimony of expert witnesses is addressed to the sound discretion of the trial court and the exercise of that discretion will not be disturbed on appeal unless such ruling is clearly erroneous or there has been a clear abuse of discretion. *Spence v. Wiles*, 255 Md. 98, 257 A. 2d 164 (1969); *Dobson v. Mulcare*, 26 Md. App. 699, 338 A. 2d 898 (1975);

*Murphy v. Bd. of County Comm'rs*, 13 Md. App. 497, 284 A. 2d 261 (1971). While it is unclear from the record in this case what happened to the jacket, *i.e.*, whether it was retained by the appellant or the State, we observe that if the State had the jacket, no *subpoena duces tecum* was issued by appellant for its production, nor was the State otherwise called upon to produce it. Further, we note, as did the trial judge, that other persons were available to the appellant to testify to the color of the jacket. Under the circumstances we see no abuse of discretion in Judge Hargrove's declining to allow appellant to call an expert witness to give his interpretation of the color of the jacket, as depicted by the black and white photograph.

## V

### *Tina Green's Testimony*

Tina Green's counsel was called as a witness for appellant. The attorney testified that Tina Green's trial had ended in a mistrial and that counsel had requested Gwendolyn Felder, Green's "classification officer or social worker" at the jail, to explain the nature of the plea bargain that counsel was endeavoring to enter into on behalf of Green. Ms. Felder subsequently telephoned Green's attorney and advised the attorney that she had discussed the plea bargain in a meeting " '. . . with the two girls,' " Green and the appellant. Green's counsel ". . . expressed great shock that she [Ms. Felder] took this course." On the basis of Ms. Felder's speaking to both Green and appellant, appellant sought to preclude the testimony of Green. Appellant declared that her constitutional rights ". . . were violated by her being called into a meeting by a government official [Ms. Felder] was a witness who would testify against her when she was not represented by counsel." Appellant asserts that the meeting with the city employed social worker was, specifically, a violation of her *Miranda* rights and, thus, Green's testimony should have been excluded. While we agree with the appellant that the better course of conduct would have been for the social worker not to have interviewed Green and the appellant together for the

purpose of explaining the plea bargain to Green, we fail to see how that interview proscribes Green's testimony at the trial of the appellant. Green's testimony was based upon the statement she gave to the police on the night of the slaying and not upon what may or may not have been said during the interview with the social worker. The social worker's possible infringement upon appellant's *Miranda* rights, occurring subsequent to the time that Green had made her statement to the police concerning her own and appellant's involvement in the crime, does not retroactively vitiate Green's prior statement nor prohibit Green from testifying relative to that statement at appellant's trial.

## VI

### *Evidentiary Rulings*

Appellant claims that State's Exhibit 3, a human blood stained, eight (8)-inch knife found at the scene of the slaying; Exhibit 4, a short knife recovered from behind the door in the ladies' rest room where the decedent was found; Exhibit 7, a handbag; Exhibit 9, the victim's eyeglasses upon which there were blood stains; Exhibit 10a, a photograph of coins that were discovered in the handbag; and Exhibit 10b, an envelope containing earrings that were in the handbag; should not have been admitted into evidence because all were irrelevant.

J. Wigmore, *A Student's Textbook of the Law of Evidence* 36 (1935) defines "irrelevant" as meaning, in strictness, ". . . that the offered piece of evidence has no probative value. The rules of circumstantial evidence are what determine irrelevancy."

1 F. Wharton, *Criminal Evidence* § 151 (13th ed. C. Torcia 1972) states substantially the same principle:

". . . Any evidence which is helpful in getting at the truth of a material issue is relevant, even though it is only a link in the chain of facts which must be proved to make the proposition at issue appear more or less probable.

". . . Evidence will be excluded as irrelevant, then,

when the fact which it would prove or disprove is not material to the prosecution or defense."

. . This Court, in *Parker v. State,* 7 Md. App. 167, 189, 254 A. 2d 381, 393 (1969) said:

"It is established that only the probability of connection with the accused or the crime is required for the admission of evidence. Lack of positive identification goes to the weight of the evidence not to its admissibility."

The testimony in the instant case manifests that the eight (8)-inch knife was found at the murder scene; the knife contained human blood; the victim had been stabbed to death; Green said appellant possessed a knife during the accosting of the victim; the appellant was treated for lacerations on two fingers; Green testified that appellant had jabbed at the victim. Although the eight (8)-inch inch knife, State's Exhibit 3, was not specifically identified as belonging to the appellant or having been used by her during the commission of the crime, we think the testimony adduced by the State demonstrates "the probability of connection with the accused." *Parker v. State, supra.* Judge Hargrove did not err in admitting the knife into evidence.

Exhibit 4, the short knife, was relevant because of Green's admission that she had possessed that knife and discarded it at the scene of the slaying behind a door, where it was found, because she did not want to leave with it.

Exhibits 7, 9, 10a, and 10b, the handbag, eyeglasses, photograph of coins, and the earrings were all relevant. The handbag was found on the steps leading to the rest room hallway. Green said that appellant and the victim were ". . . speaking about the pocketbook or something." The photograph of the coins and the envelope containing the earrings were admissible as contents of the handbag. All of the exhibits were connected by "probability" to the offense, hence, all were admissible. The fact that the trial judge subsequently granted a judgment of acquittal on the robbery count does not eliminate the challenged physical evidence.

They are admissible as evidence of the murder charge, not just the robbery.

The admission of the tennis shoes, Exhibit 14, into evidence was proper as a physical exhibit of the appellant's probable presence at the scene of the crime. The blood samples, Exhibit 15, and the "evidence control slip", Exhibit 16, pertaining to the blood samples, were so interlaced as to be almost inseparable for evidentiary purposes. Both were admissible as tending to show appellant's presence at the scene through blood comparison. Appellant's blood type matched blood found on the bus station first floor and entrance doors.

## VII

### The Character Witness

The appellant called a social worker as a character witness. The witness told the jury that she had known appellant since "... the latter part of 1970" when the witness's daughter brought the appellant to the home of the witness, her husband and her four children. Appellant moved into the witness's home and while living there did not cause the witness any problem "whatsoever." Appellant was "a big help" assisting with the care of the witness's "small children", and with "housework". The State moved to strike the testimony of the witness on the ground that it was not character evidence. The trial judge agreed, ordered the testimony stricken, and instructed the jury to disregard it.

Appellant argues that the court erred because Courts and Judicial Proceedings Article § 9-115 permits the testimony of the witness. Section 9-115 provides:

"Where character evidence is otherwise relevant to the proceeding, no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character, either in person or by deposition, in any suit, action or

proceeding, civil or criminal, in any court or before any judge, or jury of the State."

We recently, in *Taylor v. State,* 28 Md. App. 560, 346 A. 2d 718 (1975), said that Courts Art. § 9-115 "vastly broadened" the common law rule relative to character witnesses.[4] We opined:

". . . No longer is a character witness prevented from speaking of specific acts or precluded from demonstrating a basis of knowledge leading to his own independent opinion. To an extent, this State has eliminated some of the underlying hearsay present in the common law rule relative to character witness testimony." (Footnote omitted).

The testimony of the character witness, in the instant case, was properly stricken by the trial judge. His action was proper because the witness, while stating a basis of knowledge which could have led to her articulating her own independent opinion of the reputation of the appellant, was never asked any question concerning that reputation. The trial court was left with a foundation for posing questions concerning the appellant's reputation, but no structure was erected upon that foundation. In short, the witness was not asked, and did not give, a personal opinion of the appellant's reputation. Consequently, she was not properly a "character witness."

## VIII

### *The Jury Instruction*

The trial judge in his advisory instruction to the jury said:

". . . Now, felonious homicides are divided into three classes, first degree murder, second degree murder, and manslaughter. And if you find from all the evidence in the case beyond a reasonable doubt to a moral certainty that the Defendant

---

**4.** We also pointed out in Taylor v. State, *supra,* that when the law speaks of "character witness" it is using the word "character" as a synonym for "reputation".

[Appellant] is guilty of homicide, that is, one degree of homicide with nothing else, the law presumes that that is murder in the second degree and the State has the burden of proving the elements of the crime which would raise the degree to murder in the first degree, that is, that it was wilful, deliberate and premeditated. *The Defendant [Appellant] has the burden of showing elements which reduce the crime to manslaughter.* Where the evidence shows that death resulted from gross negligence or merely unlawful conduct and there was no intention to take a life or that the crime was committed without premeditation but in hot blood and under provocation the crime is manslaughter and manslaughter is not murder. The essential distinction between murder and manslaughter is the presence of malice. Malice has been defined in this connection as intentional doing of a wrongful act to another without legal justification or excuse. And it includes any wrongful act done wilfully and purposefully. The essential difference between murder in the second degree and murder in the first degree is that in order to establish murder in the first degree in addition to malice there must be shown the elements of deliberation and pre-meditation. The law presumes that all homi-cides be committed with malice aforethought and to constitute murder. All murders which shall be perpetrated by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree and that is codified in Article 27, Section 407 of the laws of Maryland. *In order to justify a conviction of murder in the first degree you must find from the evidence the actual intent, the fully formed purpose to kill with enough time for deliberation and premeditation to convince that the purpose is not the immediate offspring of rashness and impetuous temper and that the mind has become fully conscious of its own design."* (Emphasis supplied).

Appellant's counsel noted timely exceptions to the charge, but those exceptions are not directly in point with the issue she now poses to us. We shall, however, take cognizance of the instruction as constituting a potential violation of appellant's constitutional rights as enunciated by *Mullaney v. Wilbur*, 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975), and thus "plain error" within the meaning of Md. Rule 756 g. *See Brown v. State*, 14 Md. App. 415, 287 A. 2d 62 (1972) for a discussion of the meaning of "plain error" as used in Md. Rule 756 g.

When Judge Hargrove advised the jury, he relied upon what was believed to be the law of Maryland that all homicide was presumed to be murder in the second degree,[5] and that the State had the burden of elevating the crime to first degree murder, while the accused carried the burden of reducing the offense from second degree murder to manslaughter. What the Maryland courts, for years, have seen so clearly as that rule of law, it develops, is, under the recent decision of *Mullaney*, not the law at all.

Judge Moylan, in a thorough exposition of *Mullaney*, states, in *Evans v. State*, 28 Md. App. 640, 349 A. 2d 300 (1975), that *Mullaney* proscribes the placing of a burden of proof upon a defendant in a criminal cause and that *Mullaney* ". . . must be given fully retroactive effect."

Because of the *Mullaney* holding, and its "built in" retroactive feature, as explicated by *Evans*, the trial judge's advisory instruction concerning the "presumption" of second degree murder in all homicides and that the burden of proof was upon the accused to reduce the offense to manslaughter was erroneous. Were it not for the jury's verdict of murder in the first degree, we might be compelled to reverse and remand for a new trial. The incorrect advisory jury instruction, in this case, even with its faulty predicate as to the burden of proof shouldered by appellant, nevertheless, will not require reversal because the State has met its ultimate burden of persuasion and elevated the crime to that of murder in the first degree.

---

5. Indeed, that principle of law had been controlling for generations. *See* Evans v. State, *infra.*

In *Evans* at § I. C., Judge Moylan said:

"... [A]ny error in instructing as to the allocation of the burden of persuasion on the subject of mitigation (such mitigation, for purposes of holding the homicidal *mens rea* down to the manslaughter level, being fairly an issue in the case) will have been cured by a verdict of murder in the first degree. The evil aimed at by *Mullaney v. Wilbur*, where the issue is manslaughter versus murder, is that a presumption of malice unfairly relieves the State of the burden of proving non-mitigation (mitigation being fairly an issue in the case). Where the ultimate verdict is that of murder in the second degree, the presumption may, therefore, have been pivotal. Where, on the other hand, the verdict is murder in the first degree, the State will have proved every element, including the negating of hot blood, beyond a reasonable doubt and due process will not have been offended." (Footnote omitted).

*Evans* prescribes, in effect, an appellate litmus paper test in murder cases where *Mullaney* is interposed and the verdict was guilty of murder in the first degree. In such situations an erroneous instruction relative to a presumption of second degree murder arising *ipso facto* from a bare showing by the State of homicide is cured by the verdict of murder in the first degree because it is clear that the State has met its ultimate burden and proved that the crime was committed with wilful, deliberate and premeditated malice, the essential ingredients of first degree murder. By so proving to the satisfaction of the trier of fact, at a jury or a non-jury trial, the State has disproved second degree murder. Similarly, an erroneous instruction concerning an accused's burden of lowering the offense from second degree murder to manslaughter is likewise cured because the State has negated to the satisfaction of the trier of fact, any mitigation. The net result, in such cases, of incorrect instruction where mitigation or "hot blood" is not an issue fairly in the case, is that the instruction, at worst, is

harmless beyond a reasonable doubt under *Harrington v. California*, 395 U. S. 250, 254, 89 S. Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967), and, at best, a gratuity given for the benefit of the accused and to which he was not entitled.

Appellant, at trial, denied all knowledge of the crime, denied ever seeing the decedent in the bus station rest room, denied she cut her hand during an altercation with the decedent, but explained that her hand was cut before she went to the bus station. Appellant admitted, however, being at the bus depot and using the ladies' rest room. Appellant has by her own testimony expressly negated the common law offense of manslaughter through her disclaimer of all knowledge of the act. Patently, if she knows nothing of the crime, she could not have committed it in "hot blood" or with recklessness, devoid of intention to take a human life. Even though Green spoke of the "commotion" between appellant and the decedent, we think, in the light of appellant's testimony, that fact does not fairly inject mitigation as an issue in the case. Nevertheless, if mitigation were fairly in the case, the State has met its burden of proof by establishing, to the jury's satisfaction, that the appellant was guilty, beyond a reasonable doubt, of murder in the first degree. *Mullaney* does not affect the ultimate result in the instant case.

Similar reasoning to that employed here is found in *Wilkins v. Maryland*, 402 F. Supp. 76 (D. Md. decided October 1, 1975). There Judge Blair of the United States District Court for the District of Maryland, addressing an almost identical contention as that raised by appellant, held:

> "... In finding Wilkins guilty beyond a reasonable doubt of the wilful, deliberate and premeditated killing of the victim — or alternatively, of killing the victim during the perpetration of a robbery — the jury necessarily rejected, *beyond a reasonable doubt*, that the defendant acted recklessly without an intention to take a life or in the heat of passion. Phrased otherwise, in proving the elements of first degree

murder beyond any reasonable doubt in the jurors' minds, the [S]tate necessarily disproved manslaughter beyond a reasonable doubt."

Under the rationale of *Evans v. State, supra,* as articulated by this Court, and *Wilkins v. Maryland, supra,* as reasoned by Judge Blair, the trial judge's instruction concerning burden of proof upon the appellant to reduce the crime from second degree murder to manslaughter was plainly in error, but harmless.

## IX

### Motion for Judgment of Acquittal

Finally, appellant contends that the trial court should have granted a judgment of acquittal in her favor. In order for the appellant to prevail on this issue, however, the record must show that there was no legally sufficient evidence before the jury to entitle it to deduce therefrom that the appellant was guilty beyond a reasonable doubt of the offense charged. If, however, the evidence was such that a jury could fairly be convinced of the guilt of the accused beyond a reasonable doubt, the verdict of the jury will not be disturbed on appeal. *Wilson v. State,* 261 Md. 551, 276 A. 2d 214 (1971); *Mason v. State,* 12 Md. App. 655, 280 A. 2d 753 (1971); *Coolahan v. State,* 10 Md. App. 365, 270 A. 2d 669 (1970); *Shotkosky v. State,* 8 Md. App. 492, 261 A. 2d 171 (1970).

The test for the sufficiency of the evidence, as stated in numerous cases, is whether that evidence, if believed, either shows directly, circumstantially, or supports a rational inference of facts to be proved from which a jury could fairly be convinced beyond a reasonable doubt of the guilt of the accused. *Kelly v. State,* 16 Md. App. 533, 298 A. 2d 470 (1973) *aff'd* 270 Md. 139 (1973); *Carter v. State,* 15 Md. App. 242, 289 A. 2d 837 (1972); *Conway v. State,* 15 Md. App. 198, 289 A. 2d 862 (1972); *Young v. State,* 14 Md. App. 538, 288 A. 2d 198 (1972); *Metz v. State,* 9 Md. App. 15, 262 A. 2d 331 (1970).

Without recounting all the evidence presented by the State, it is enough to know that the State showed in its

presentation that the decedent was stabbed to death in a ladies' room in the bus station in Baltimore City; that the appellant and Green were seen exiting the bus depot; that the appellant was observed wearing a particular type of apparel; that one of the two persons who were seen leaving the depot was bleeding; that the appellant sought treatment in the emergency room of Maryland General Hospital, which is nearby the bus station; that at the scene of the crime someone had stepped into a pool of blood; that the appellant's hand was cut; that she had blood stains on her shoe; that the blood stains on the soles of appellant's shoes matched the blood type of the victim; that appellant's blood type matched that found in the trail of blood; that appellant's blood type was different from the victim's; that appellant had a knife; that an eight-inch long knife was found at the scene of the crime; that Green testified that the appellant had a "commotion" with the decedent and "jabbed" the victim; that the eight-inch knife found at the scene bore traces of human blood; and that the other knife belonged to Green; that appellant, while denying the crime, placed herself at the site where it was committed. Such evidence, if believed, certainly gives rise to a rational inference that the decedent was stabbed to death, and that the appellant was the perpetrator of the crime.

*Judgment affirmed.*