No. 83-59

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

DOUGLAS McKENZIE STROUD,

Defendant and Appellant.

---

APPEAL FROM:  District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Milodragovich, Dale & Dye; Michael Milodragovich
argued, Missoula, Montana
Moses Law Firm; Charles F. Moses argued, Billings,
Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Robert L. Deschamps, III, County Attorney, Missoula,
Montana:  Ed McLean and Karen S. Townsend argued,
Deputy County Attorneys, Missoula, Montana

---

Submitted:  January 26, 1984

Decided:  May 17, 1984

Filed:    MAY 17 1984

*Ethel M. Harrison*

---
Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Defendant Douglas McKenzie Stroud appeals from his conviction and sentence in the District Court of the Fourth Judicial District, Missoula County, for negligent homicide. We affirm.

During the early morning hours of March 14, 1982, Missoula County Sheriff's deputies responded to a shooting incident in the Rattlesnake area north of Missoula, Montana. Upon arriving at the scene, the deputies spotted a man, later identified as the defendant, Douglas McKenzie Stroud, standing outside a residence. Both deputies noticed that Stroud was carrying a gun. He surrendered the weapon voluntarily, was handcuffed, and placed in the rear of the deputies' patrol car. Two deputies then entered the residence.

After entering, one of the deputies heard and observed a woman later identified as Annette Stroud, the defendant's ex-wife, shouting and screaming. The deputy checked the woman to see if she was injured. Determining that she was physically unhurt, the deputy proceeded to check the rest of the home for an injured party. In the basement, the deputy discoved a nude male, later identified as Curt Jacky, whose chest was covered with blood. The deputy determined that Jacky had been shot. Together with an emergency medical technician who had just arrived with an ambulance, the deputy concluded that Jacky was dead.

The deputy secured the house and then went outside to await the arrival of the chief of detectives. While waiting, he overheard the defendant Stroud make several statements, including "my own house, my own kids in the house, a guy in bed with my wife," and "what would you have done?"

2

An autopsy of Jacky revealed that he died of a gunshot wound to the chest and abdomen. Other abrasions and soot marks were found on the body, indicating that other gunshots had been fired near Jacky. The defendant suffered no bullet wounds or powder burns. The examining physician concluded that the fatal shot entered Jacky's body at an angle of 60° left to right and 25° downward. A firearms examiner for the State Crime Laboratory concluded that the fatal shot and other abrasions came from a Smith and Wesson Model 66 .357 revolver taken from the defendant by sheriff's deputies.

Annette Stroud and the defendant had been married from June, 1975 to January, 1982, having separated briefly in 1978 and July, 1981. Attempts at reconciliation were made after the final divorce papers had been served. During defendant's trial, Annette testified that her relationship with Stroud had been difficult, and she related several incidents of extramarital associations and physical violence. At various times during their unhappy marriage, Annette testified that Stroud had pointed guns at her, had held her to the floor with a knife at her throat, had slapped her and had strangled her with a jacket or his hands. Although their divorce had become final in January, 1982, property settlement and child custody arrangements were still pending and were the subject of much dispute between Annette and the defendant. A court hearing on these matters had been scheduled for March 17, 1982, three days after the shooting incident.

In early February, 1982, Annette took part in two ski trips in Idaho. During her second trip, she met Stroud, who was returning to Missoula from a business trip in Nevada. Her meeting with Stroud was not a harmonious one, and she more than once refused his amorous advances. In the

3

meantime, she had met Curt Jacky, an Idaho resident. She spent more than one time with Jacky, and Stroud was apparently aware of this association, as one evening, Jacky had received a call from Stroud, who was then looking for Annette.

On March 13, 1982, Stroud visited his old home in the Rattlesnake to take pictures of the house and its various rooms and to take his oldest son, Ian, for a visit. Jacky had called Annette that same day and had told her he was driving to Missoula for a visit. He arrived shortly before dinner in a blue Corvette with a personalized license plate, "Curt." Annette, Curt, and Ian went to dinner and a movie. The three then returned to Annette's home, where Ian and his younger brother were left with a babysitter while Annette and Curt went dancing. The couple returned to the home about 12:30 a.m. and shortly thereafter went to bed. Prior to retiring, Annette checked all the doors to be certain they were locked.

On that same evening, Stroud and his live-in girlfriend, JoAnn Jennings, had also attended a movie. At trial, Jennings indicated that Stroud was depressed and had left their apartment about 12:20 a.m. to visit his former residence. Before leaving, Stroud left the telephone number of his lawyer with Jennings in the event he might end up in trouble. Apparently, Stroud was not permitted to be at the residence because of the divorce. Stroud indicated that the purpose of his visit was to photograph Jacky's blue Corvette, which he had observed sometime earlier, in order to show that Annette was entertaining "overnight guests." Stroud apparently believed his pictures would bolster his position in the

4

child custody proceedings set for March 17. Before leaving, he armed himself with the .357 revolver.

Upon arriving at his former home, Stroud did not photograph the car. Instead, he entered the house with a key made previously and proceeded to the upstairs bedroom. He opened the door and began taking pictures of Annette and Curt Jacky, who at the time were engaged in an intimate position. Stroud flashed four pictures while the couple strove to get up from the bed. He ordered them to sit on the bed, as he wanted to talk with them. Curt asked permission to put on his clothes, but this request was refused. Annette later testified that she tried to reach the phone to dial 911, but Stroud grabbed the phone and threw it down the hallway. According to Annette, Stroud then remarked, "sit down or I'll kill you." Stroud then advanced toward her, but she tried to get past him to recover the phone. Stroud then jumped back, pointed the .357 revolver in her face, cocked it, and said, "sit down or I'll kill you, too."

Stroud then reached out and pushed Annette on the shoulder, causing her to lose her balance and fall backward. As she fell, she saw Curt go past her. She put on her robe and rushed to the hallway, only to hear the gun go off and Curt fall down the stairs to the basement family room. While an apparant struggle ensued between Stroud and Jacky, Annette attempted to call 911, but was unable to get a clear line because another house phone was off the hook. She then heard two more gunshots, two "really awful moans," and finally Curt Jacky saying, "you killer." Stroud then came up the stairs and, according to Annette, pointed the gun at her again and said, "I ought to kill you, too. It won't do any more harm."

5

Stroud then called 911 himself to report a shooting. He then called JoAnn Jennings to get his lawyer's phone number, and then called his lawyer. He again called the 911 operator. When Annette asked Stroud why he had done this, he replied, "Because I love you." By this time, Annette had discovered the nude body of Curt Jacky lying at the bottom of the stairs. After completing the calls, Stroud went outside to await the arrival of authorities.

The defendant's version of the events leading up to and including the shooting acknowledges his marital problems with Annette, as well as many of the incidents that occurred during his presence in the home. He claimed, however, that the pistol was brandished only for self-defense, and that Jacky had jumped him while he was trying to leave. He admitted pointing the gun at Annette and the victim. He also admitted that he did not take a picture of Jacky's car, as he had told Jennings he would do. Finally, he acknowledged that he was entering a "high-risk" situation when entering the home during the early morning hours of March 14. There is some question as to whether other weapons were in the home that morning, although Stroud had personally removed some of his guns before March 14 and had been told by Annette that the other weapons were not in the house. He claimed that he had never made a direct threat with a gun on any person with the exception of himself.

Stroud was charged with deliberate homicide for the death of Curt Jacky. He was tried in June, 1982, before a jury. Prior to giving the case to the jury, the trial judge instructed the jury on mitigated deliberate homicide and negligent homicide as well as deliberate homicide. The jury acquitted Stroud of deliberate and mitigated deliberate

homicide, but returned a guilty verdict for negligent homicide. The trial judge subsequently sentenced Stroud to the maximum of ten years, with seven suspended, plus an additional ten years for committing the offense with a dangerous weapon. He was also designated a dangerous offender.

On appeal, Stroud raises the following issues:

(1) Whether the jury in his case was properly impaneled?

(2) Whether evidence of "other crimes or acts" was properly admitted?

(3) Whether Stroud was properly convicted of negligent homicide?

(4) Whether Stroud was denied his constitutional right to bear arms?

(5) Whether Stroud's actions directly caused Jacky's death?

(6) Whether Stroud was properly sentenced?
In disposing of this case, we treat Issue Five together with Issue Three, as both are concerned with the appropriateness of the jury's negligent homicide verdict.


WHETHER THE JURY WAS PROPERLY IMPANELED?

On June 1, 1982, the date originally set for trial, the trial judge brought the fifty-five prospective jurors into court for a meeting. Neither the prosecutors, defendant, nor defense counsel were present. The judge proceeded to explain the trial process in general and asked the members of the jury panel whether everyone could serve two weeks. As a result of this inquiry, two prospective jurors were excused from duty. No record was kept of this meeting. Apparently the trial was rescheduled for June 7, at which time a regular

7

voir dire examination was conducted by counsel with defendant present.

Prior to the beginning of regular voir dire, defense counsel moved to discharge the jury panel on grounds that the meeting of June 1 held outside defendant's presence was in violation of defendant's constitutional and statutory guarantees of presence during trial. The motion was denied, but the trial judge explained the events of June 1 as follows:

> "I'll deny [the motion] inasmuch as what I told the people who were drawn was--I questioned them about their ability to serve for two weeks, and I think that's within my discretion in impaneling them, the jury panel. It's true there was no record. No one was present but me and the clerk, but the only discussion was about whether people could come, and I discharged, I think, two people as a result of that.
>
> ". . .
>
> "You can assume when I impaneled the jury or brought in and qualified the panel I told them basically what the outline of our trial would be, and I'll do that again this morning, at least so much of it as seems useful, so get right into the questions that are necessary, that are related to their state of mind and their ability to serve. . . . Nor do I want the usual harangue of--not the usual, but particularly--but one I've heard many times about how the court process works, etcetera. I already told them that, so I just want to get into the questions so we can get them picked." Transcript of Proceedings at 5, 8.

On appeal, defendant renews his objection, claiming prejudice and error resulting from the trial court's actions. We disagree with this assessment.

We accept the trial judge's explanation of the events of June 1. There is no hint of prejudice here. The situation under attack here is little different from one described in Brown v. State (1975), 29 Md.App. 1, 349 A.2d 359. In

8

Brown, a defendant challenged the right of a trial judge to instruct prospective jurors outside defendant's presence on the meaning of important legal concepts like "probable cause" and "beyond a reasonable doubt," matters far more crucial than the general outline of a criminal trial and ability to sit for two weeks. The jurors in Brown were not advised how to apply the legal concepts to the particular set of facts in that case. Apparently this educational program is common in trial courts in Baltimore, Maryland. 29 Md.App. 1, 349 A.2d at 362.

The Maryland Court of Special Appeals rejected the defendant's challenge in view of the purely educational nature of the trial court's examination and of the fact that this examination was not a "critical stage" in the proceedings against the defendant. 29 Md.App. 1, 349 A.2d at 362-63. See also People v. Hawks (1919), 206 Mich. 233, 172 N.W. 405, where the Michigan Supreme Court found no evidence of prejudice in the trial judge's reading of instructions to jurors on their civic duties and where the defendant was not present. Similarly, we find no evidence of prejudice in the trial court's explanation of the criminal trial process and determination of prospective jurors' ability to sit for a two-week trial when the defendant and counsel were not present.

In reaching this conclusion, we are not suggesting that the trial judge's essentially educational examination should be adopted by other district judges. Nor are we suggesting that the judges's method of examination was the best one. Certainly a record of any such proceedings should be maintained. Here, we conclude only that there is no credible evidence of prejudice to the defendant Stroud.

## WHETHER EVIDENCE OF "OTHER CRIMES OR ACTS" WAS PROPERLY ADMITTED

Defendant objects to the introduction of "other crimes or acts" evidence against him at trial, specifically (1) the testimony of Annette Stroud during the State's case-in-chief concerning the defendant's violent behavior toward her during their marriage; and (2) the testimony of rebuttal witnesses Nancy Alderson, Ivan Alderson, and Ladene Priddy concerning defendant's past conduct.

With respect to Annette's testimony, defendant insists that it is prejudical and was admitted contrary to Rule 404(b), the substantive guidelines of State v. Jensen (1969), 153 Mont. 233, 455 P.2d 631, and the procedural guidelines of State v. Just (1979), 184 Mont 262, 602 P.2d 957.

Rule 404(b) provides that:

> "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Admissibility is also governed by specific substantive and procedural rules. The four substantive requirements are (1) similarity between the crime charged and the previous crimes, wrongs or acts; (2) nearness in time between the charged crime and the previous crimes, wrongs or acts; (3) tendency to establish a common scheme, plan or system; and (4) determination that the probative value of the evidence is not substantially outweighed by the prejudice to the defendant. Jensen, supra, 153 Mont. at 239, 455 P.2d at 634 and Rule 403, Mont.R.Evid. In addition, three procedural guidelines must be followed: (1) notice to the defendant prior to trial

that evidence of other crimes, wrongs or acts will be introduced; (2) an admonition by the judge to the jury when the evidence is introduced that it is admitted solely for one or more of the accepted purposes stated in Rule 404(b); and (3) a cautionary jury instruction to the same effect, providing in unequivocal terms that the evidence is admitted for the purpose earlier stated and not to try and convict the defendant for prior wrongful conduct. Just, supra, 184 Mont. at 274, 602 P.2d at 963-64. These procedural rules were crafted from similar procedures used in Minnesota. See State v. Billstrom (1967), 276 Minn. 174, 149 N.W.2d 281; State v. Spriegl (1965), 272 Minn. 488, 139 N.W.2d 167.

On appeal, the State takes the initial position that the Jensen-Just analysis does not apply, and that the correct analysis should be that followed in State v. Riley (Mont. 1982), 649 P.2d 1273, 39 St.Rep. 1491; State v. Trambley (Mont. 1980), 620 P.2d 367, 37 St.Rep. 1871, and State v. Jackson (1979), 180 Mont. 195, 589 P.2d 1009. We disagree. In the Riley-Trambley-Jackson line of cases, we were concerned with prior wrongful acts inextricably or inseparately linked with the crime charged, as opposed to prior wrongful acts which are wholly independent of the crime charged, although similar to it. In the instant case, we are concerned with the latter type of crimes or acts, and therefore the Jensen-Just rules apply.

## 1. Similarity of Crimes or Acts

Annette Stroud testified to several violent acts committed by the defendant during the course of their marriage. Some of these involved no more than intimidation and threats; others, however, included unacceptable physical contact. The State introduced evidence of these prior acts to show a

11

common scheme, plan, or design in the defendant's conduct, i.e., the threat and possible carrying out of violence to intimidate Annette and/or those associated with her.

Annette's version of events of March 14 suggests a similarity between the acts committed that evening and the prior acts. Defendant was armed, pointed his weapon at Annette and Jacky, mouthed verbal threats concerning their lives, and physically shoved Annette. In the instant case, a death occurred, and that appears to be the only difference between the acts committed on March 14 and those committed previous to that time. We think the evidence of prior acts is similar enough to the acts involved in the immediate case to justify their admission based on the State's theory of the case. Any doubts as to similarity are assuaged by our conclusion, discussed infra, that Annette's testimony was not prejudicial because of the jury's ultimate verdict.

2. Nearness in Time

All of the events described by Annette took place within one to three-and-one-half years of the events of March 14. In Just, supra, we held that the nearness in time test was satisfied by proof of prior acts committed three years before the charged crime. 184 Mont. at 269, 602 P.2d at 961. Under the circumstances, we hold that the prior acts were committed sufficiently close in time to meet this standard.

3. Tendency to Establish a Common Scheme, Plan, or System.

Defendant's prior threats and assaults were apparently designed to intimidate and manipulate Annette into cooperating with him. Indeed, at one point in her testimony, Annette indicated that she did not seek divorce on an earlier occasion because of these threats. The defendant's actions on

12

the morning of March 14 appear to be consistent with his past attempts to influence Annette with violence. Evidence of these actions was therefore admissible.

### 4. Probative Value v. Prejudicial Effect

Evidence of defendant's prior acts was unquestionably probative of the State's theory that Stroud's actions were not an isolated event, and that he had the requisite purpose or knowledge to commit homicide. There is of course the serious potential of prejudice to the defendant, but we do not believe the potential manifested itself in reality. The defendant was acquitted of both deliberate and mitigated deliberate homicide. It is difficult to see what prejudice was suffered under these circumstances. The finding of negligent homicide implies a finding that defendant either consciously disregarded the risk of death or disregarded a risk of which he should have been aware, either situation embodying a gross deviation from the conduct of a reasonable man. The jury necessarily had reasonable doubts about defendant's present conduct being part of a common scheme, plan, or system of conduct. The negligent homicide verdict suggests that defendant's conduct was measured as of March 13 and 14, with prior acts being virtually irrelevant. Thus, the prospect of prejudice is at most minimal.

### 5. Notice and Purpose

The State gave defendant notice that it would introduce evidence of other crimes in order to prove that the defendant's action were part of a common scheme, plan or system.

### 6. Admonition to the Jury

At no time before, during or after Annette's testimony did the court admonish the jury concerning the evidence of prior wrongful acts and the limited purposes for which the

13

testimony was permitted. Although language in a prior deci-sion, State v. Case (Mont. 1980), 621 P.2d 1067, 1071-72, 37 St.Rep. 2057, 2063, suggests that such an omission is revers-ible error, we hold that in this case, no reversible error was committed, principally because of defense counsel's failure to object to the court's failure to admonish the jury before, during, or immediately following Annette's testimony.

A problem similar to the one before us has been consid-ered by the Minnesota Supreme Court, the drafter of the guidelines which inspired Just. In State v. Schweppe (1975), 306 Minn. 395, 237 N.W.2d 609, the Minnesota high court declined review of alleged failures to give notice and a cautionary instruction when defense counsel in that case did not protest the absence of notice and did not request an appropriate instruction. 306 Minn. 395, 237 N.W.2d at 616. Two years later, in State v. Forsman (Minn. 1977), 260 N.W.2d 160, the court addressed a similar problem, i.e., where notice was properly given, but where cautionary instructions were neither requested or given. After analyzing the prob-lem, the court concluded that:

> ". . . once the state has given notice . . . the other Spriegl-Billstrom proce-dures became mandatory only upon the defendant's objection and/or request. Defendant's failure to request limiting instructions in this case is inexplica-ble. We reiterate that the trial court should, sua sponte, give an unequivocal limiting instruction both at the time the evidence is admitted and at the close of trial. But in the absence of a request, its failure to do so was not reversible error." Forsman, supra, 260 N.W.2d at 169. (Emphasis added.)

See also State v. Clark (Minn. 1980), 296 N.W.2d 359, 368 n. 7 (dictum) (failure to request Billstrom limiting instruction waives claim of error).

14

We reach the same result here. To allow defense counsel to remain silent while a trial judge fails to admonish a jury is tantamount to permitting counsel to plant errors in the trial proceedings consciously. This we cannot and will not allow. Therefore, once the State has given notice under Just that it will introduce evidence of other crimes or acts, the remaining procedures become mandatory only upon defendant's objection and/or request. As the court did in Forsman, we remind trial judges that admonition of the jury still should be done sua sponte.

7. Cautionary Instruction

Prior to closing arguments, the trial judge gave the following instruction to jurors concerning the "other crimes or acts" evidence:

> "You are instructed that evidence of other acts, wrongs, or crimes has not been admitted for the purpose of proving other acts. Such evidence was received only for the limited purpose of impeaching statements or conclusions of either the defendant or other witnesses and for no other purpose. You are warned that to convict for any act except that charged may result in unjust double punishment. The defendant is not being tried and may not be convicted for any offense except that charged. You are cautioned to weigh the evidence only for the limited purpose earlier stated."
> (Emphasis in original instruction.)

This instruction, given as Court's No. 33, was based on defense counsel's Proposed Instruction No. 45, except that the second sentence was rewritten by the trial judge without objection by the county attorney or defense counsel.

This instruction unquestionably omits discussion of the "common scheme, plan or system" theory of the State's argument for introducing Annette Stroud's testimony, although the State, for whatever reason, did not object to this omission.

15

On appeal, defendant objects to this instruction on grounds that it somehow places Annette's testimony before the jury in an unduly prejudicial way.

We cannot find a defensible basis for defendant's argument. The failure of defense counsel to object to this instruction on the grounds of undue prejudice forecloses review. See Forsman, supra. Moreover, we have already emphasized the strong prospect that Annette's testimony was not prejudicial because of the jury's ultimate verdict of negligent homicide. Nevertheless, we admonish trial judges and counsel in future cases to consider carefully the content and impact of any cautionary instruction.

In addition to criticizing Annette Stroud's testimony, defendant challanges rebuttal testimony by Nancy Alderson, his former wife, Ivan, Nancy's current husband, and Ladene Priddy about prior assaults on Annette by defendant. This evidence, admitted to rebut defendant's claims on the witness stand that he was a peace-loving, nonviolent man, was admissible under Rule 404(a)(1), Mont.R.Evid.

WHETHER THE DEFENDANT WAS PROPERLY CONVICTED OF NEGLIGENT HOMICIDE?

Defendant maintains that his negligent homicide conviction was improper for three reasons: (1) the negligent homicide statute is either ambiguous or suffers from a failure to give the defendant notice so that he can conform his conduct to its requirements; (2) the evidence is insufficient to establish negligent homicide, assuming a correct interpretation of the law; and (3) the jury instructions are inappropriate to satisfy the requirements of due process, presumably

16

because of problems inherent in the negligent homicide statute.

Initially, we note with respect to the propriety of the statute and the instructions based upon it that any errors alleged by defendant were invited. The State was out to prove deliberate homicide, and objected to the giving of any instructions pertaining to mitigated deliberate or negligent homicide. Defense counsel, however, convinced the trial judge to give instructions on these points. We are therefore disinclined to review arguments, however vague, on the propriety of negligent homicide law. Nevertheless, we think the statute and accompanying instructions quite clear, unambiguous, and appropriate. The real issue is whether there is sufficient evidence to permit the jury to reach the verdict of guilty beyond a reasonable doubt. We believe there is such evidence.

At trial, the defendant pictured himself as a concerned parent out to protect his interest in a child custody hearing. His actions at his former residence were characterized as self-defense. The jury did not accept this theory or the State's contention that defendant either purposely or knowingly killed Curt Jacky. The conclusion that defendant was guilty of negligent homicide was proper in light of the evidence. When defendant left his apartment and prepared to enter his former residence armed and contrary to a court order, he knew or should have known that he would be entering a high risk situation. His actions toward Annette and Curt Jacky, especially those involving the brandishing of a dangerous weapon, were very risky. He instigated and continued a struggle involving the great risk of serious injury or death. Defendant's assertion that he was defending himself

when his alleged attacker was naked and unarmed was obviously deemed implausible by the jury, and there is no reason to dispute the jury's conclusion.

The available evidence was sufficient for the jury to conclude that defendant had acted "negligently" within the meaning of Section 45-2-101(37), MCA, and was therefore guilty of negligent homicide under Section 45-5-104, MCA. We will not overturn this judgment.

Our analysis of the evidence also convinces us of the groundlessness of defendant's assertion that "causation" is not shown or demonstrated by competent evidence. There is no question that a bullet from Ken Stroud's weapon caused Curt Jacky's death. The only remaining question is whether Jacky would have lived but for Stroud's conduct. The answer is clearly yes. Defendant's conduct involved a gross deviation from the conduct of a reasonable man. Had defendant chosen not to pursue this unreasonable line of conduct, Curt Jacky would not have been shot and killed. The evidence supports the jury's implicit conclusion that defendant's negligent act "caused" Jacky's death.

WHETHER DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO BEAR ARMS?

Defendant's position here is that he was acquitted of deliberate homicide and mitigated deliberate homicide because the jury believed his self-defense argument, and that the subsequent conviction for negligent homicide can only be based on the improper belief that possessing a weapon, a right protected under Mont. Const. Art. II, Sec. 12, was itself negligent.

18

We agree with the State that defendant's argument is incredible. The argument is based not only on faulty assumptions concerning the jury's verdict, but also on an unbelievably strained construction of the constitutional right to bear arms. Initially, we note that it is pure conjecture to argue that the jury believed defendant's self-defense theory or concluded that carrying a weapon was enough to constitute negligence. More importantly, the right to bear arms conveys no right or privilege to enter a residence without permission, threaten its unarmed occupants, and discharge a weapon under unreasonable conditions. The finding of negligent homicide as defined by statute in no way infringes on the constitutional right to possession of firearms.

WHETHER THE DEFENDANT WAS PROPERLY SENTENCED?

Defendant raises five objections to sentencing procedures in his case: (1) the sentence was for punishment rather than for prevention of further crime or for reformation of the defendant; (2) the sentence effectively punishes him for being an ex-policeman, and thus violates his right to equal protection; (3) the sentence for knowing use of a weapon cannot be applied to negligent homicide; (4) no hearing was held concerning any unusual or substantial duress suffered by defendant during the shooting incident; and (5) the trial judge's private meeting with the probation officer concerning the pre-sentence investigation report was improper.

Defendant's first argment is clearly without merit. There is no question that Mont. Const. Art. II, Sec. 28, provides that "[l]aws for the punishment of crime shall be founded on the principles of prevention and reformation." However, there is no evidence or authority cited by defendant

19

to establish that Stroud's sentence will not deter either him or others from future wrongful conduct, or that the sentence will not lead to reformation.

Defendant's equal protection claim is equally groundless. Defendant cites no authority for the proposition that the extra ten-year sentence for use of the weapon somehow treats him unfairly. As a former policeman, defendant was more aware than a layman of the risks entailed in entering a potentially explosive emotional situation with a deadly weapon. Policemen are not a protected class of citizens, so any classification affecting a member of that group need only have a rational basis. Given the evidence produced at trial, holding defendant to a greater knowledge of the risks inherent in his actions, for the purpose of deciding whether his sentence should be enhanced under Section 46-18-221(1), is unquestionably reasonable and therefore constitutionally sustainable.

Defendant's third argument is similarly unconvincing. It is somewhat incongruous to argue that he acted as he did in self-defense, and then maintain that the negligent homicide verdict somehow prohibits a finding that defendant "knowingly" used a weapon within the meaning of the enhancement statute, Section 46-18-221(1), MCA. Nevertheless, we need not ponder this inconsistency. In State v. Hubbard (Mont. 1982), 649 P.2d 1331, 39 St.Rep. 1608, we held that a person can knowingly use a firearm and still be negligent by grossly deviating from the conduct of a reasonable person in a similar situation with regard to the results of his actions. That decision is applicable to the facts of this case.

Defendant's claim that he may have been within one of the exceptions to mandatory minimum sentencing, i.e., acting under unusual or substantial duress, is not well-founded, and he is therefore not entitled to a separate hearing on this issue. Initially, we note that defendant received the maximum sentence for negligent homicide, not the minimum. Because the judge was not disposed to give the minimum sentence, there is no chance that he would have given less than the minimum sentence. This case is similar to State v. Zampich (Mont. 1983), 667 P.2d 955, 40 St.Rep. 1235, where in the case of a mitigated deliberate homicide conviction, we found no error in the trial court's failure to make specific findings pursuant to Section 46-18-222(2) and (3) when the trial court imposed a sentence greater than the mandatory minimum sentence for mitigated deliberate homicide. Just as it would have been wasteful for the trial court in the Zampich case to make findings about unusual or substantial duress when it had concluded that more than the mandatory minimum sentence should be imposed, it would be equally redundant to order a separate hearing into similar mental conditions in this negligent homicide case where the maximum sentence was applied.

In any event, the trial court heard substantial evidence during the trial from psychologists and lay witnesses concerning defendant's mental state. Had a separate hearing under Section 46-18-222 been required, the fact that a hearing was not held would have been harmless error in view of the testimony offered at trial.

Finally, the off-the-record meeting between the judge and the probation officer without the presence of defendant or counsel was not improper in this case. In State v.

21

Redding (Mont. 1984), 675 P.2d 974, 41 St.Rep. 147, this Court held that these off-the-record proceedings were violative of due process. However, the Redding rule is to be applied prospectively, and does not pertain to "sentences rendered before the date of [the] decision [Jan. 24, 1984]" unless the information in the presentence report "is shown to be inaccurate or prejudicial." Redding, supra, 675 P.2d at 977, 41 St.Rep. at 147. Here, defendant was sentenced on August 18, 1982, and does not allege any inaccuracies in the presentence report or any prejudice arising from its use by the trial judge. Accordingly, the Redding rule will not be applied in this case.

The conviction and sentence of defendant Douglas McKenzie Stroud are affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

Mr. Justice John C. Sheehy, dissenting:

I am amazed that defendant Stroud has appealed his conviction for negligent homicide in this case. On the facts, he is fortune's favorite in that the jury did not find him guilty of deliberate or at least mitigated homicide. The sentencing judge slapped him with a hard sentence for a negligent crime, but if his appeal were successful and another trial granted, his luck might run out and he might find himself convicted of a greater crime. Since he appeals, I take it seriously, I would grant his wish and reverse for a new trial on two grounds treated lightly by the majority.

First, I believe the District Court erred in interrogating prospective jurors without a record outside the presence of counsel and defendant. While we have not yet decided whether voir dire examination of jurors is part of a criminal trial, it seems as much a part as a starter is of an automobile. It is not enough, therefore, to approve a private empanelment of jurors by relying on the later statement of the judge that he said nothing prejudicial to the defendant. We have no record to support the judge, and prejudice must be presumed. Section 46-16-303, MCA, requires the examination of prospective jurors to be conducted by the county attorney and the defendant or his counsel. It also permits "additional" examination by the court. I would hold that such "additional" examination can only occur at or immediately after the voir dire by counsel, with all present.

Second, it does not make judicial sense to state that under Just (184 Mont. 262, 602 P.2d 957) the District Court

must sua sponte give a limiting instruction on other crimes evidence, and then fault defense counsel for not objecting when the District Court fails its duty. Defense counsel does not thereby entrap the court; it entraps itself by its own neglect. Since other crimes evidence is admissible only as an exception to the rule of evidence, this Court must be careful to make sure the jury understands its exceptional nature, and its limited probative use. The state should be as alert as the Court in making sure the explanatory instruction is given, especially since it is the state that marshals the other crimes evidence. Yet the state gains by the majority's rule on this point. It is the defendant, whose innocence should be presumed, who loses for an oversight of the Court. A sense of fair play should dictate another result.

As to the sentence itself, I would return for resentencing before another district judge because of the incident where the District Court here had a private interview with the pre-sentence investigator before imposing sentence. Defendant's due process rights were violated. State v. Redding (Mont. 1984) 41 St.Rep. 147, __ Mont. __, 675 P.2d. 974.

_John C. Sheehy_

I join in the dissent of Mr. Justice Sheehy.

_Daniel J. Shea_
Justice

- 24 -